## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JAN CHRISTINE JONES, | CASE NO. 1:13-cv-02161-GBC |
| Plaintiff, | |
| | (MAGISTRATE JUDGE COHN) |
| v. | |
| CAROLYN W. COLVIN,<br>ACTING COMMISSIONER OF<br>SOCIAL SECURITY, | MEMORANDUM |
| Defendant. | Docs. 1, 6, 7, 8, 11 |

## I.    Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying the application of Plaintiff Jan Christine Jones for disability insurance benefits ("DIB") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act"). In this case, the ALJ concluded that Plaintiff did not meet a Listing, was not able to perform her past relevant work, but was able to perform work in the national economy. Plaintiff challenges only the ALJ's Listing assessment. She does not challenge the residual functional capacity assessment, credibility findings, assignment of weight to the medical evidence, or step five conclusion. However, in order to qualify for a Listing, Plaintiff must meet all of the stringent medical criteria. Plaintiff failed to establish a diagnosis of lumbar spinal stenosis, an inability to ambulate, or muscle weakness, all of which are required for Listing 1.04(C). Plaintiff failed to establish that her depression was sufficiently persistent to qualify under Listing 12.04, and also failed to establish that she had marked impairments in at least two of the Paragraph B criteria. Because Plaintiff raises no other issues on appeal, substantial evidence supports the ALJ's decision.

## II.   Procedural Background

On February 25, 2010, Plaintiff filed an application for DIB under Title II of the Act. (Tr. 282-88). On April 28, 2010, the Bureau of Disability Determination denied this application (Tr. 135, 153-56), and Plaintiff filed a request for a hearing on June 29, 2010.  (Tr. 157-58). On June 29, 2011 and February 23, 2012, an ALJ held a hearing at which Plaintiff—who was represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 30-134).  On March 30, 2012, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 9-29). On May 5, 2012, Plaintiff filed a request for review with the Appeals Council (Tr. 7-8), which the Appeals Council denied on June 25, 2013, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-5).

On August 15, 2013, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On October 23, 2013, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 6, 7). On November 11, 2013, Plaintiff filed a brief in support of her appeal ("Pl. Brief"). (Doc. 8). On January 14, 2014, Defendant filed a brief in response ("Def. Brief"). (Doc. 11). On April 30, 2014, the Court referred this case to the undersigned Magistrate Judge. Both parties consented to the referral of this case for adjudication to the undersigned on June 16, 2014, and an order referring the case to the undersigned for adjudication was entered on July 3, 2014. (Doc. 13, 14).

## III.   Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. Johnson v. Commissioner of Social Sec., 529 F.3d 198, 200 (3d Cir. 2008); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Substantial evidence is a deferential standard of review. See Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004).

Substantial evidence "does not mean a large or considerable amount of evidence." <u>Pierce v.</u>
<u>Underwood</u>, 487 U.S. 552, 564 (1988). Substantial evidence requires only "more than a mere
scintilla" of evidence, <u>Plummer v. Apfel</u>, 186 F.3d 422, 427 (3d Cir. 1999), and may be less than
a preponderance. <u>Jones</u>, 364 F.3d at 503. If a "reasonable mind might accept the relevant
evidence as adequate" to support a conclusion reached by the Commissioner, then the
Commissioner's determination is supported by substantial evidence. <u>Monsour Med. Ctr. v.</u>
<u>Heckler</u>, 806 F.2d 1185, 1190 (3d Cir. 1986); <u>Hartranft v. Apfel</u>, 181 F.3d 358, 360 (3d Cir.
1999); <u>Johnson</u>, 529 F.3d at 200.

### IV.   Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must demonstrate an
"inability to engage in any substantial gainful activity by reason of any medically determinable
physical or mental impairment which can be expected to result in death or which has lasted or
can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §
423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits
show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education,
> and work experience, engage in any other kind of substantial gainful work which exists in
> the national economy, regardless of whether such work exists in the immediate area in
> which he lives, or whether a specific job vacancy exists for him, or whether he would be
> hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible
for disability benefits. <u>See</u> 20 C.F.R. § 404.1520; <u>see also</u> <u>Plummer</u>, 186 F.3d at 428. If the
Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence,
review does not proceed. <u>See</u> 20 C.F.R. § 404.1520.   The Commissioner must sequentially

determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. See 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four.   If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the claimant. See 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

## V. Relevant Facts in the Record

Plaintiff was born on January 13, 1965 and was classified by the regulations as a younger individual through the date of the ALJ decision. 20 C.F.R. § 404.1563. (Tr. 313).   She has a high school and college education and past relevant work as a Bus Driver, Teacher Aide II, Job Development Specialist, and Case Worker. (Tr. 23).

## Physical Impairments

The only issue raised by Plaintiff regarding her physical impairments is that the ALJ should have found that she met or equaled Listing 1.04(C), which requires:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disk disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equine) or the spinal cord. With:

> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b;

20 C.F.R. Part 404, Subpart P, Appendix 1, Section 1.04(C). Consequently, the Court will limit its discussion to the medical evidence of Plaintiff's physical impairments pertinent to those factors.

On February 9, 2010, Plaintiff injured her back when she fell on ice. (Tr. 344). She went to her primary care physician that day, but refused to get undressed for examination. (Tr. 346). She had good leg strength with "no leg weakness." (Tr. 354). She had tenderness in her back and buttocks. (Tr. 346). She had X-rays, which were normal. (Tr. 355, 367). On February 18, 2010, she reported neck pain that radiated into her buttocks. (Tr. 344).

On April 2, 2010, Plaintiff continued to complain of back pain, including pain on forward bend. (Tr. 352). She denied pain in either leg. (Tr. 352). On April 19, 2010, notes indicate that an MRI of her lumbar spine was entirely normal, and she was prescribed physical therapy. (Tr. 353, 370). The MRI report specifically stated "there is no evidence of…spinal stenosis." (Tr. 370).

Plaintiff had a physical therapy evaluation on May 21, 2010. (Tr. 390). She "ambulate[d] with a stiff pattern, but towards the end of the evaluation has more antalgia with limited [left leg] weight bearing, and shifted away from the left." (Tr. 390). Plaintiff had "difficulty with transitional movements supine to sit to standing to sidelying." (Tr. 390). Her range of motion was "very limited in all directions." (Tr. 390). Her pain would radiate into her leg, but only on the left side. (Tr. 390). At physical therapy on May 28, 2010, Plaintiff reported that she could walk two to three blocks, at most. (Tr. 394). On June 1, 2010, she "walk[ed] into therapy with straight posture, no antalgia." (Tr. 395). On June 9, 2010, Plaintiff reported radiating pain, but only into her left hip. (Tr. 396). At physical therapy on June 28, 2010, Plaintiff reported that she

was walking to therapy, that she thought the exercise was good, and that she was not really hurting until she got there. (Tr. 401). She reported radiating pain, but only on the left side. (Tr. 401). On July 2, 2010, Plaintiff indicated that she was continuing to walk to therapy, although she had to stop and stand to rest. (Tr. 402). On July 9, 2010, she indicated numbness, but only in her left leg. (Tr. 403). Plaintiff was discharged from physical therapy on July 15, 2010 with her goals not met. (Tr. 404-05).

On May 26, 2010, Plaintiff presented to Keystone Family Medicine complaining of gastrointestinal problems and low back pain. Although she described her pain as a 9.5 out of 10 and was very careful about getting in and out of her chair, the nurse practitioner observed:

> On discharge the nurse says she saw her drop a magazine and she picked it up without bending her knees and she did that briskly. I also went out to see her get into her car and she put her butt on the seat and brought her legs up all in one swift motion and seemed to have no difficulty getting into the car.

 (Tr. 510).

On July 25, 2010, Plaintiff presented to the emergency room at Chambersburg Hospital complaining of back pain. (Tr. 388). She indicated that she had numbness in her left arm and left leg. (Tr. 388). However, her strength was 5/5 throughout. (Tr. 388). There was "no atrophy." (Tr. 388).

On July 31, 2010, an MRI of Plaintiff's cervical spine indicated "Mild multilevel disc bulge extending from C3-4 through C6-7. At C5-6 levels, mild right paracentral disc bulge can be seen with slight compression of thecal sac and right nerve root." (Tr. 386).

On August 7, 2010, Plaintiff presented to the emergency room at Chambersburg Hospital complaining of back pain. (Tr. 385). Notes indicate that she had an MRI that indicated disc herniation. (Tr. 385).  She indicated that her medications were not helping her, but she had

normal strength and denied weakness. (Tr. 385). Notes indicate the doctor noted "I am not sure I have much to offer this patient" and Plaintiff was discharged home. (Tr. 385).

On August 9, 2010, Plaintiff presented to Keystone Family Medicine complaining of back pain that radiated into both legs. (Tr. 501). She indicated that activities of daily living aggravated her pain, and that standing relieved her pain. (Tr. 501). On August 10, 2010, Plaintiff presented to Keystone Family Medicine for forms to be filled out for her Medical Access card. (Tr. 496). She had back pain, but was negative for muscle weakness. (Tr. 496).

On October 12, 2010, Plaintiff was evaluated by Dr. Barbara Haeckler at Keystone Family Medicine. (Tr. 490). She was "very upset and angry from the time [Dr. Haeckler] entered the room." (Tr. 490). Dr. Haeckler wrote:

> I needed to look at her MRIs and studies and this made her more angry. Said she didn't care about the results. Went over to her purse and pulled out the vicodin and said it wasn't working then left. Did not give me a chance to help her. I would have given her a replacement but she got up and said "I want Paula." From the time I entered the room, it was apparent that she assumed that I would be resistant to treating her. I imagine she has been given a hard time and not believed that she is in pain. Pt. needs to be referred to pain mgmt.

(Tr. 490). Later that day, Paula Hamilton, CRNP, called Plaintiff and offered a referral to pain services, which Plaintiff declined. (Tr. 487). They agreed that Plaintiff would start methadone. (Tr. 487).

On December 24, 2010, Plaintiff presented to Ms. Hamilton at Keystone Family Medicine requesting a pregnancy test and for her sugar to be checked. (Tr. 482). She had pain and muscle spasm. (Tr. 484).

On February 25, 2011, Plaintiff presented to Ms. Hamilton at  Keystone Family Medicine for a medication refill and back pain. (Tr. 479). She had pain that radiated from her lower back, but only to her left buttock. (Tr. 479). She reported having trouble doing activities of daily living

by herself, such as carrying laundry, vacuuming, and washing the floor, although she did not indicate any problems with just walking. (Tr. 479). She was negative for gait disturbance. (Tr. 479).

On March 14, 2011, Plaintiff presented to the emergency room at Chambersburg Hospital. (Tr. 529). She reported that she "was holding her car door open when a truck came by and the gust of wind caught the door and jerked her arm. She apparently is experiencing a lot of pain in her left shoulder and into the upper arm region...No other pain or injury." (Tr. 529). Her past medical history indicated only ADHD and asthma. (Tr. 529).

On March 25, 2011, Plaintiff presented to Dr. Timothy Sempowski, D.O., of Pain Medicine of Franklin County complaining of back pain that radiated down her left side. (Tr. 411). She reported her pain "as a constant, sharp, burning, prickly, pressure, stinging, grabbing, gnawing, stabbing, grinding, shooting, tingling, jabbing, aching, throbbing sensation associated with numbness in the left arm and left leg." (Tr. 411). Plaintiff's motor strength was normal in both legs. (Tr. 412). Dr. Sempowski cited to the July 31, 2010 MRI that indicated slight nerve root compression. (Tr. 412). He assessed her to have "chronic neck and low back pain with radicular left arm and leg pain secondary to the cervical degenerative disc disease and lumbosacral spondylosis." (Tr. 412). He planned for a cervical epidural steroid injection and possible facet blocks in the future. (Tr. 412).

On April 19, 2011, Plaintiff presented to the emergency department at Chambersburg Hospital for constipation.  (Tr. 442). She did not mention back pain. (Tr. 442).

On May 4, 2011, Plaintiff had a cervical epidural steroid injection. (Tr. 573). On June 1, 2011, Plaintiff followed up at Pain Medicine of Franklin County. (Tr. 680). She reported that her epidural injection had not provided her with any relief. (Tr. 680). She was stable with no new

findings, no sensory deficits, and no motor deficits. (Tr. 680). He assessed her to have pain that radiated only to her left side. (Tr. 680).

On June 22, 2011, an MRI of Plaintiff's cervical spine indicated slight disc bulges and protrusions that slightly touch and impinge on the spinal cord. (Tr. 575). An MRI of Plaintiff's lumbar spine indicated a mild disc protrusion that minimally abuts the left S1 nerve root. (Tr. 577). On October 22, 2011, routine nerve conduction studies were conducted on bilateral upper and lower extremities, and all of the results were normal, except chronic neurogenic changes in the right upper extremity and left lower extremity. (Tr. 580-81).

On September 29, 2011, plaintiff followed-up with Ms. Hamilton. (Tr. 638). She had to switch to Adderall because her insurance would not cover Ritalin. (Tr. 639). She reported back pain and indicated that she was still treating at Wellspan. (Tr. 639). Ms. Hamilton opined that Plaintiff should live in a first floor apartment from a medical standpoint because walking up and down stairs was very painful for her. (Tr. 637).

On October 10, 2011, Plaintiff presented to physical therapy for an evaluation for pool therapy. (Tr. 593). She was still living out of her car. (Tr. 593). At an evaluation on November 10, 2011, she reported that she had to drive an hour an fifteen minutes to Harrisburg the day before, sit in Harrisburg for an hour, and drive back. However, while she stated the drive back hurt her, she stated that the drive to Harrisburg and sitting was "OK." (Tr. 594). She reported that her walking tolerance was better and that she could sit for up to sixty minutes at a time. (Tr. 594). She had a place to live and was doing more housework. (Tr. 594). She was "doing stairs non-reciprocally." (Tr. 594). On December 10, 2011, she reported that she was using a cane if she loses her balance and was "doing stairs non-reciprocally." (Tr. 595). Her exercises included marching for five minutes. (Tr. 605). On December 14, 2011, she reported increased pain after

carrying laundry up and down a flight of stairs. (Tr. 606). However, on December 28, 2011, Plaintiff was unable to complete her marching exercises because she felt dizzy. (Tr. 608).

On November 21, 2011, Plaintiff followed up with Ms. Hamilton. (Tr. 629). She presented with back pain and Attention Deficit Disorder. (Tr. 629). She seemed to be "moving better today, able to get up and down easier." (Tr. 630).

On December 2, 2011, Plaintiff had an MRI of the brain, which indicated mild enhanced signal but no abnormal enhancing mass. (Tr. 609).

On January 11, 2012, Plaintiff saw Ms. Hamilton. (Tr. 621). She stood during the entire visit due to pain and walked with a cane. (Tr. 622). Plaintiff reported that her neurosurgeon indicated that "no surgery was needed at this time because there was no nerve root involved." (Tr. 621). She reported that she was upset because she was unable to care for herself or engage in activities of daily living, such as cleaning her house or doing her laundry. (Tr. 621). On January 18, 2012, notes from Ms. Hamilton indicated that Plaintiff had not been admitted to Home Aide services (Tr. 617). It had taken them five days to locate Plaintiff. (Tr. 617). She wanted help cleaning her house, but they only offer private pay services for that, so she refused. (Tr. 617). They offered skilled nursing services, but she refused that as well. (Tr. 617).

**Mental Impairments**

On March 24, 2009, Plaintiff was admitted to Chambersburg Hospital with chest pain, and indicated that she had been experiencing some anxiety. (Tr. 356). On July 8, 2009, Plaintiff presented to Keystone Family Medicine complaining of fatigue, but stated that she was not feeling depressed. (Tr. 350).

In Plaintiff's emergency room report from the day of her fall on February 9, 2010, she indicated that Ritalin was one of her present medications. (Tr. 373). On February 18, 2010,

Plaintiff presented to Keystone Family Medicine for a follow-up of her back pain. She was also "requesting Ritalin prescription, she hasn't used it for a while because she has been out of work, but she says she knows that she is going to be doing paper work and she is going to need it." (Tr. 344). However, in Plaintiff's August 7, 2010 emergency room visit for back pain, she indicated that she was not taking Ritalin. (Tr. 385).

At physical therapy on June 11, 2010, Plaintiff indicated that she was under emotional stress due to lack of money and insurance. (Tr. 397). Her physical therapist indicated that she wanted to try to get Plaintiff into craniosacral therapy to help with emotional stress. (Tr. 397). At Plaintiff's December 24, 2010, Plaintiff appointment with Ms. Hamilton, there was "no evidence of depression." (Tr. 483). At Plaintiff's February 25, 2011 appointment with Ms. Hamilton, she was negative for psychiatric symptoms. (Tr. 479).

However, at Plaintiff's March 25, 2011 appointment with Dr. Sempowski, her mood was "sad, depressed and frustrated depending on the level of pain." (Tr. 411). On July 18, 2011, Plaintiff followed-up with Ms. Hamilton complaining of depression. (Tr. 655). Ms. Hamilton prescribed citalopram and referred her to psychiatry at Plaintiff's request. (Tr. 655). She had the symptoms of a major depressive episode and was experiencing depressed mood, diminished interest or pleasure, fatigue or loss of energy, feelings of guilt or worthlessness, poor concentration, indecisiveness, significant change in appetite, sleep disturbance, and thoughts of death or suicide. (Tr. 655). She had many situational stressors, she was homeless and could not move into the shelter because her brother works there. (Tr. 655). She was teary-eyed during her visit. (Tr. 656).

Plaintiff was voluntarily hospitalized at Chambersburg Hospital for worsening depression and suicide ideation from September 2, 2011 to September 9, 2011. (Tr. 585). She had

discontinued her medications from Dr. Mania on her own. (Tr. 586). She reported severe anxiety and was easily startled because of her past abusive relationship with her ex-husband. (Tr. 586). On admission, she was assessed a GAF of 35 and her attention span was "not too good." However, her mood symptoms resolved and she tolerated her medication. (Tr. 585). "A lot of her stressors were related to her housing situation," and she agreed to go to a shelter. (Tr. 585). She was assessed a GAF score of 60 on discharge and was cognitively intact with goal-directed thought processes. (Tr. 585). She was instructed to follow-up with Dr. Mania, but Plaintiff did not submit any subsequent treatment records from Dr. Mania. (Tr. 585).

At Plaintiff's November 21, 2011 appointment with Ms. Hamilton, she presented with ADHD and was "having a hard time finding her Adderall." (Tr. 629). Ms. Hamilton referred Plaintiff to Dr. Mania, who was already treating her for depression. (Tr. 629). However, there was no evidence of depression during her visit. (Tr. 630). At Plaintiff's January 12, 2012 appointment with Ms. Hamilton, she indicated that she was still seeing Dr. Mania for depression and ADHD. (Tr. 621). She was very upset and crying during the visit. (Tr. 621).

In her application, Plaintiff indicated that she had not seen a doctor or other health care professional or received treatment at a hospital or clinic, or have any future appointments scheduled, for any mental condition. (Tr. 317). In her Appeals Report, she indicated that she had not seen and would not see a doctor/hospital/clinic or anyone else for emotional or mental problems that limit her ability to work. (Tr. 323).

### Testimony and ALJ Findings

Plaintiff appeared and testified at the ALJ hearing on June 29, 2011. (Tr. 82). She testified that was presently homeless, and had been homeless for about two months. (Tr. 89). She had been staying in her car and taking showers at friends' houses. (Tr. 89). She testified that she

began receiving unemployment after her fall on the ice, and had continued receiving it until January of 2011, when it was exhausted. (Tr. 90-91). She explained that her case worker had told her to certify to the state that she was able to work. (Tr. 91). She explained that her case worker told her she would not be able to receive a Medical Access card until she applied for, received, and exhausted her unemployment. (Tr. 95). She testified that she had a driver's license and had graduated from college with a Bachelor of Arts in social service administration and a minor in business. (Tr. 94). She testified that her methadone makes her sleepy, particularly when combined with Flexeril. (Tr. 106). She explained that she had gotten angry with Dr. Haeckler because she was belittling her. (Tr. 108).

She testified that she awakens at about 6:00 a.m. every morning, and sits on the edge of her bed and reads until 9:00 or 10:00 a.m., when she gets out of bed. (Tr. 110).  She testfieid that she gets tea and walks around to stretch herself out. (Tr. 110). She testified that she showers and then goes for a walk, "a couple blocks up, couple blocks around, then come back to the house." (Tr. 111). She testified that she was unable to do anything in the afternoons because her pain medications make her sleepy. (Tr. 112). She became tearful during the hearing, but testified that no one had ever suggested that she see a psychiatrist, psychologist, or counselor. (Tr. 112). She testified that she felt that she could not perform her past work because working in her field requires safety crisis management, "getting down, pulling that distress signal." (Tr. 113). She testified that she did not feel she could do any other work because it would require extensive periods of sitting or standing. (Tr. 113). She explained that she would not be able to do work where she could alternate sitting, standing and walking because her body sometimes spasms or she falls, and that she needs a cane to walk. (Tr. 114). She alternated between sitting, standing, and leaning during the hearing. (Tr. 116).

On February 23, 2012, Plaintiff appeared and testified at the second hearing before the ALJ. (Tr. 32). She testified that she had returned to school part-time, taking an online class, but when she had her crisis in September and was hospitalized, she was removed from the class. (Tr. 34). She testified that she had no other changes in her background. (Tr. 34). She testified that she had numbness and tingling, but only down her left arm. (Tr. 55). She testified that she had problems with her right hand, where it would spasm and she would drop things. (Tr. 57). She alternated between sitting and standing every fifteen minutes during the hearing, and explained that she had pains that radiated from her back into her buttocks and legs. (Tr. 57). She testified that her physical impairments made it difficult for her to attend to her personal care. (Tr. 57). She testified that she was no longer able to walk a block and a half, which she used to do. (Tr. 59).

A vocational expert also appeared and testified. (Tr. 68). The vocational expert testified that, given the ALJ's RFC assessment, Plaintiff could not perform any past work. (Tr. 68). However, the vocational expert testified that Plaintiff would be able to engage in other work in the national economy, such as a garment folder, egg candler, and bindery machine feeder off-bearer. (Tr. 74). The vocational expert testified that, if Plaintiff needed an additional ten minute break in the morning and an additional ten minute break in the afternoon, there would be no work that Plaintiff could perform. (Tr. 77). The vocational expert testified that if Plaintiff were to be on task less than 80% of the day, there would be no work that Plaintiff could perform. (Tr. 77). The vocational expert testified that if Plaintiff needed to use a cane, she would not be able to work as a garment folder, egg candler, and bindery machine feeder off-bearer. (Tr. 79-80).

On March 30, 2012, the ALJ issued her second decision. (Tr. 25). At step one, she found that Plaintiff was insured through December 31, 2014 and had not engaged in substantial gainful activity since February 9, 2010, the alleged onset date. (Tr. 14). She found that Plaintiff's

lumbago, cervical degenerative disc disease, post-traumatic stress disorder, and depression were medically determinable and severe. (Tr. 14). At step three, she found that Plaintiff's impairments did not meet or equal a Listing. (Tr. 15).  The ALJ concluded that Plaintiff had the RFC to engage in light work, with additional restrictions. (Tr. 17). At step four, the ALJ found that Plaintiff could not engage in any past relevant work. (Tr. 23). However, at step five, the ALJ found that Plaintiff could engage in other work in the national economy, in positions like a garment folder, egg candler, and bindery machine feeder-offbear. (Tr. 24). Consequently, the ALJ determined that Plaintiff was not disabled and not entitled to benefits. (Tr. 24).

### VI.     Plaintiff Allegations of Error

### A.     The ALJ's analysis of Listing 1.04(C)

Plaintiff asserts that she meets or medically equals Listing 1.04(C). (Pl. Brief at 4). Listing 1.04 (C) requires:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disk disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equine) or the spinal cord. With:
>> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b;

20 C.F.R. Part 404, Subpart P, Appendix 1, Section 1.04(C).

One of the specified medical criteria is inability to ambulate. The regulations specifically define inability to ambulate:

> (1) Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general

definition because the individual has the use of only one upper extremity due to amputation of a hand.)

(2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Part 404, Subpart P, Appendix 1, Section 1.00(B)(2)(b). The ALJ wrote that Plaintiff did not meet any of the Listings in Section 1.04 because, "[a]s noted throughout the medial evidence of record, the claimant is able to ambulate effectively. She sometimes uses a cane for this purpose." (Tr. 16).

Plaintiff asserts that:

 Additionally, Claimant is unable to ambulate effectively as defined in 1.00B2b. Claimant has difficulty walking and experiences pain when doing so and periodically ambulates with the assistance of a cane. R. at 455, 622. Furthermore, Claimant ambulates with stiff pattern, and has difficulty with transitional movements. R. at 390. Claimant was forced to move into a first floor apartment because she was unable to walk up and down the steps due to pain. R. at 638.

(Pl. Brief at 5).

However, even accepting these claims as true, they do not satisfy the definition of inability to ambulate within Section 1.00(B)(2)(b). Plaintiff asserts that she "periodically ambulates with the assistance of a cane," but examples of inability to ambulate include "the inability to walk without the use of a walker, two crutches or two canes." Id. Plaintiff does not assert that she ever needs to use a walker, two crutches, or two canes, and needing to use a cane

"periodically" does not constitute an "inability" to ambulate without a cane. Similarly, being

unable to live in second floor apartment does not indicate that Plaintiff would be unable to

"climb a few steps at a reasonable pace with the use of a single hand rail." Id. With regard to

Plaintiff's "stiff pattern" and "difficulty with transitional movements," neither rise to the level of

inability to ambulate contemplated by the regulations. Moreover, the treatment record indicates

that, while Plaintiff had difficulty getting into and out of a chair during her appointment on May

26, 2010, Ms. Hamilton observed that:

> On discharge the nurse says she saw her drop a magazine and she picked it up without
> bending her knees and she did that briskly. I also went out to see her get into her car and
> she put her butt on the seat and brought her legs up all in one swift motion and seemed to
> have no difficulty getting into the car.

(Tr. 510). Moreover, the ALJ discounted Plaintiff's credibility. (Tr. 18). Plaintiff has not

challenged the credibility finding. Thus, substantial evidence supports the ALJ's conclusion that

Plaintiff was unable to ambulate.

Even if Plaintiff had been unable to ambulate, she fails to meet several other criteria for

Listing 1.04(C). Listing 1.04(C) requires a diagnosis of lumbar spinal stenosis. Plaintiff did not

identify any medical evidence that she has lumbar spinal stenosis. The ALJ did not find that

lumbar spinal stenosis was a medically determinable impairment at step two, and Plaintiff has

not challenged the step two analysis. Defendant pointed out that Plaintiff had not identified any

medical records showing lumbar spinal stenosis, (Def. Brief at 10), and Plaintiff did not respond

to this allegation. Moreover, the Court has reviewed the medical evidence of record, and finds no

indication of lumbar spinal stenosis. An MRI on April 9, 2010 specifically indicated that there

was no lumbar spinal stenosis. (Tr. 353).

Similarly, Listing 1.04(C) requires weakness. However, Plaintiff did not identify any

medical records that document weakness. The medical record shows that Plaintiff had little, if

any weakness. On February 9, 2010, the day she slipped on ice, she had "no leg weakness." (Tr. 354). At Plaintiff's emergency room visit on July 25, 2010, her strength was 5/5 throughout. (Tr. 388). At her emergency room visit on August 7, 2010, she had normal strength and denied weakness. (Tr. 385). On August 10, 2010, when Plaintiff presented to Keystone to get her Medical Access Card paperwork completed, she was negative for muscle weakness. (Tr. 496). At Plaintiff's pain management consultation with Dr. Sempowski on March 25, 2011, her motor strength was normal in both legs. (Tr. 412). At a follow-up on June 22, 2011, she had no motor deficits. (Tr. 575).   Moreover, Plaintiff repeatedly reported that she could walk more than "a block at a reasonable pace," including throughout her physical therapy and at her first hearing. (Tr. 390-402, ). Consequently, substantial evidence supports the ALJ's conclusion that Plaintiff did not meet Listing 1.04(C).

## B.      The ALJ's analysis of Listing 12.04(A)

Plaintiff asserts that she meets Listing 12.04(A), which requires:

> 12.04 Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
> The required level of severity of these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
> > A. Medically documented persistence, either continuous or intermittent of one of the following:
> > > 1.Depressive syndrome characterized by at least four of the following: anhedonia or pervasive loss of interest in almost all activities; appetite disturbance with change in weight; sleep disturbance; psychomotor agitation or retardation; or decreased energy; feelings of guilt or worthlessness; difficulty concentrating or thinking; thoughts of suicide; hallucinations, delusions, or paranoid thinking.
> > > …
> > AND
> > B. Resulting in at least two of the following:
> > > 1. Marked restriction of activities of daily living; or
> > > 2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Part 404, Subpart P, Appendix 1, Section 12.04. "For a claimant to show that [her] impairment matches a listing, it must meet all of the specified medical criteria." Sullivan v. Zebley, 493 U.S. 521, 531 (1990).

With regard to the Paragraph A criteria, Plaintiff asserts that:

Claimant's medical records indicate that she suffers from: diminished interest or pleasure; loss of appetite and weight loss; sleep disturbance; fatigue or loss of energy; feelings of hopelessness, helplessness, worthlessness; poor concentration; suicidal thoughts; anxiety; severe acute depression and situational anxiety; chronic PTSD; indecisiveness; and difficulty meeting home, work, and social obligations. R. at 521, 586, 590, 655. Based on the foregoing, Claimant clearly meets the requirements of Section 12.04(A), as she suffers from more than one of the symptoms required under section 12.04(A)(1). As evidenced, Claimant's mental impairments are associated with sufficient medical findings to meet the "A" criteria of section 12.04 of Appendix 1.

(Pl. Brief at 7). However, Plaintiff does not address the requirement that these symptoms have "medically documented persistence." The records cited by Plaintiff are from July 8, 2009, when Plaintiff complained only of fatigue, and her referral to psychiatric services in July 18, 2011 and hospitalization on September 2, 2011. (Tr. 521, 586, 590, 655). This indicates less than two months of medically documented symptoms required for the Listing. Consequently, Plaintiff has failed to establish the requisite persistence.

With regard to the Paragraph B criteria, Plaintiff asserts that she has a marked limitation in activities of daily living, social functioning, and concentration, persistence and pace. (Pl. Brief at 8-9). The ALJ found that Plaintiff had only a mild restriction in activities of daily living because her difficulties with personal care needs stemmed from physical impairments, she is able to prepare her own meals, perform cleaning and light household chores, has a drivers license, and does her own shopping two or three times per month. (Tr. 16). The ALJ also found Plaintiff to be

less than fully credible and assigned great weight to the opinion of Dr. Mania, and Plaintiff has not challenged these findings. (Tr. 18, 22).

> For activities of daily living, Plaintiff generically argues that:

> The ALJ erred when she concluded that Claimant's restrictions were merely "mild." R. 15. In determining such, the ALJ failed to take Claimant's entire record into consideration, which clearly indicates that she experiences depression, poor concentration, and indecisiveness. It is clear from this evidence that the ALJ erred when she determined that Claimant's restrictions were only *mild* in nature. Based on the entire record, Claimant's restrictions clearly rise to the level of marked.

(Pl. Brief at 8). Plaintiff does not further develop this argument, and does not explain how depression, poor concentration, or indecisiveness impact her activities of daily living. This constitutes a waiver of this argument. Conroy v. Leone, 316 F. App'x 140, 144 n. 5 (3d Cir. 2009) *(*citing Bagot v. Ashcroft, 398 F.3d 252, 256 (3d Cir.2005). Even if she did not waive this argument, she did not challenge the ALJ's assertion that she has no problems with personal care stemming from mental impairments, can perform her own meals, perform cleaning and light household chores, has a driver's license, and shops two or three times per month. A reasonable mind would accept this evidence as adequate to conclude that Plaintiff suffers only a mild restriction in activities of daily living, so substantial evidence supports this determination.

> Plaintiff asserts that she has a marked limitation in social function because:

> [A]s a result of her severe depression, she has difficulty meeting home, work, or social obligations. R at 655. Additionally, Claimant suffers from a sad and depressed mood which diminishes her interest or pleasure, and results in feelings of worthlessness and guilt. Id. Claimant's records also indicate thoughts of death or suicide. Id.

(Pl. Brief at 8-9). The ALJ found that Plaintiff had mild difficulties in social functioning because "she gets along 'fine' with authority figures and has never been laid off from a job due to an inability to get along with others. She tries to take short walks every day. She attends church possible." (Tr. 16).

The only record Plaintiff cites is from Plaintiff's July 18, 2011 referral to psychiatric services. This single treatment record is insufficient to demonstrate a "marked" impairment, which requires her impairments to "interfere seriously with [her] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Part 404, Subpart P, Appendix 1, Section 12.00.   Moreover, Plaintiff is citing symptoms that are required for Paragraph A, but does explain how they relate to Paragraph B. Beyond generically asserting that she "has difficulty" with "meeting home, work, or social objections," she does not explain how her sad or depressed mood, diminished interest or pleasure, feelings of worthlessness or guilt, or thoughts of death or suicide impact Plaintiff's social functioning. Moreover, she does not directly challenge the ALJ's assertion that "she gets along 'fine' with authority figures and has never been laid off from a job due to an inability to get along with others. She tries to take short walks every day. She attends church possible." (Tr. 16). A reasonable mind would accept this evidence as adequate to conclude that Plaintiff had mild difficulties in social functioning.

The ALJ found that Plaintiff has moderate limitations in concentration, persistence and pace because:

> The claimant takes narcotic pain medication which adversely affects her concentration and focus. She reports a need to be reminded to go places. The claimant alleges that she does not handle stress of changes to her routine well. She describes her ability to follow written and spoken directions as "okay at times." The claimant reports that she finishes what she starts.

(Tr. 16). Plaintiff asserts that she has marked limitations in concentration, persistence and pace because:

> The ALJ correctly concluded that Claimant takes narcotic pain medication which adversely affects her concentration and focus, however, separate from that, Claimant needs to be reminded to go places; cannot handle stress or changes to her routine well; and follows written and spoken directions "okay at times." R. at 16. However the ALJ again mischaracterizes Claimant's difficulties as "moderate," as Claimant in fact suffers marked difficulties. Id.

(Pl. Brief at 9). However, even if Plaintiff had marked limitations in concentration, persistence, and pace, such limitation would be insufficient to meet the Listing because the ALJ properly found that Plaintiff had less than marked limitations in activities of daily living and social functioning, and Plaintiff does not challenge the ALJ's conclusion that she had no episodes of decompensation. Moreover, the Plaintiff does not explain how the ALJ's conclusions were incorrect, beyond generically asserting that the ALJ mischaracterized her difficulties. She does not address the ALJ's justification that Plaintiff can "finish what she starts." (Tr. 16). A reasonable mind would accept the fact that Plaintiff can finish what she starts as adequate to conclude that her limitations with concentration, persistence, and pace did not "interfere seriously with [her] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Part 404, Subpart P, Appendix 1, Section 12.00.  Consequently, substantial evidence supports the ALJ's analysis of Listing 12.04(A).

## VII.    Conclusion

Therefore, the Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1382c; Brown, 845 F.2d at 1213; Johnson, 529 F.3d at 200; Pierce, 487 U.S. at 552; Hartranft, 181 F.3d at 360; Plummer, 186 F.3d at 427; Jones, 364 F.3d at 503. Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla of evidence. It does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971). Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands.

Monsour Med. Ctr., 806 F.2d at 1190. Here, a reasonable mind might accept the relevant evidence as adequate. Accordingly, the Court will affirm the decision of the Commissioner pursuant to 42 U.S.C. § 405(g).

An appropriate Order in accordance with this Memorandum will follow.

Dated: September 26, 2014                          s/Gerald B. Cohn
                                    _____
                                          GERALD B. COHN
                                    UNITED STATES MAGISTRATE JUDGE